## August J. Austerlade, Administrator, Appellee, v. Chicago City Railway Company, Appellant.

### Gen. No. 19,958.

1. STREET RAILROADS, § 85*—*care required in case of frightened team.* The operator of a street car is under a duty to exercise reasonable and ordinary care under the circumstances to avoid the danger of frightening horses, and a street railway company is liable if the fright of a horse or team is caused by the making of unusual and unnecessary noises, or appearances, in the operation of its cars.

2. STREET RAILROADS, § 85*—*sufficiency of evidence to establish liability for frightening animals.* Where plaintiff's intestate's decease was due to his being thrown against and under a sweeper street car, while attempting to hold his team while standing in front of them, the evidence is *held* to show that the motorman might reasonably have anticipated danger from the frightened horses unless he reduced the speed of or stopped the car, and that if he did not actually observe their condition, he should have done so in time so as to avoid such danger.

3. TRIAL, § 233*—*when pleadings may be taken by the jury.* While it is the better practice not to allow the declaration to be taken by the jury while endeavoring to reach a verdict, yet it is not reversible error to so allow.

Appeal from the Circuit Court of Cook county; the Hon. JOHN A. DOWDALL, Judge, presiding. Heard in the Branch Appellate Court at the October term, 1913. Affirmed. Opinion filed December 22, 1914.

CHARLES LEROY BROWN, for appellant; LEONARD A. BUSBY, JAMES G. CONDON and WARNER H. ROBINSON, of counsel.

QUIN O'BRIEN, for appellee; MUNSON T. CASE, of counsel.

MR. PRESIDING JUSTICE BARNES delivered the opinion of the court.

This appeal is from a judgment recovered by appellee on account of the death of appellee's intestate, one

*See Illinois Notes Digest, Vols. XI to XV, and Cumulative Quarterly, same topic and section number.

Kroessin, alleged to have been caused by the negligence of appellant in running a snow sweeper under circumstances that caused the fright of a team of horses standing near the street curb and a consequent movement by them whereby said Kroessin, who was endeavoring to hold and govern them, was thrown on the car tracks in front of the sweeper, causing injuries from which he died.

We shall refer to appellee and appellant as plaintiff and defendant respectively.

The declaration is in four counts. The first two are predicated upon negligence by defendant's servant in continuing to run the snow sweeper at a high and dangerous rate of speed and with great noise towards and close to the team of horses when said defendant knew they were there, and that on account of the appearance of the snow sweeper and its noise when run, particularly at a high rate of speed, it was apt to scare horses. The first count contains the allegation that such running of the car was without warning (which was not essential to the cause of action, nor, in our opinion, sustained by the proof), and the second count charges that the servant knew, or in the exercise of reasonable care would have known, that the team was frightened and that said Kroessin was endeavoring to calm and hold them, but that, without waiting for them to be calmed and brought under control, continued to run the sweeper as aforesaid, knowing it was extremely dangerous so to do under such circumstances.

The third count is predicated upon the claim that the motorman knew, or in the exercise of reasonable care would have known, that plaintiff's intestate was thrown to the track in a position of peril in time for him to have stopped the car and avoided the accident. The fourth count is based upon the claim of wilful

and wanton negligence. We do not think the evidence is sufficient to sustain either of the last two counts.

The accident took place on Wentworth avenue in the city of Chicago, a street running north and south, between 72nd and 73rd streets, about 160 feet south of 72nd and opposite a house on the west side of Wentworth avenue known as No. 7216. Said Kroessin and his colaborer, Schibille, were engaged in delivering a stove at said house. Kroessin was the driver of the team. He had driven and stopped it alongside of the curb in front of the house with the horses facing north. Their tugs had been unloosened and the two men were engaged about their work when the sweeper approached from the north on the west tracks of the street. The sweeper, or car, in question differed in appearance from an ordinary car, mainly in the parts below the flooring, which was higher above the street than that of an ordinary car. There was a broom under each end placed diagonally across the bottom of the car, but not then in motion, and along the ends and part of the sides of which were canvass curtains with certain devices for fastening them a few inches above the rails.

On the occasion in question, in April, 1910, the sweeper, under the guidance of a motorman, was being taken to a barn for the purpose of storage. The evidence shows that it was going from eight to ten miles an hour, and produced an unusual noise (at least noticeably different from the ordinary street car), due to its peculiar structure or rattling of its parts, or the flapping of the curtains, or all of these. Plaintiff's witnesses laid much stress on the flapping of the curtains. Defendant, however, contended that they were securely fastened so as to prevent it. There was controversy as to whether the gong was continuously ringing.

Whatever may have been the facts with regard to these and other controverted questions of fact, the evi-

Austerlade v. Chicago City Railway Co., 190 Ill. App. 92.

dence clearly shows that as the car crossed or left 72nd street, the horses became noticeably nervous and excited, raising, tossing and shaking their heads and quivering and moving about on their feet in a manner that indicated a serious state of fright. Their actions were observed not only by others, but by the motorman and his companion, and while the witnesses, as usual, varied somewhat in their descriptions, yet the entire testimony produces the conviction that their actions were such as gave the motorman timely warning of impending danger. He claimed that another sweeper passed them shortly before his did, that he observed their uneasiness then, but that they calmed down after it passed and did not indicate serious fright at the approach of his car. There was some controversy over the fact as to whether another sweeper did pass the horses. But, while that was one of the questions of fact for the jury, we think its importance is unduly magnified, for it would not necessarily follow that the second car could pass them without causing serious fright because the first did, when indications were to the contrary. The important fact was whether their actions were such as to indicate such serious fright as called for slowing or stopping the car before they were reached.

It appears that Kroessin, observing their freight, left the sidewalk or parkway near the curb, took hold of their reins near the bits and tried to hold and calm the horses as the sweeper in question approached; that the horses became more violent in their actions, and just about the time the car reached them, swung towards the car around to the side of the wagon, and in that movement threw Kroessin on the tracks immediately in front of the car or directly under the fore part of it; that the motorman, unaware of the accident, drove the car on until a cry on the street caused him to stop it about 170 feet farther south, and that Kroessin was there taken out from underneath it so injured

that he died. We think there is a manifest preponderance of evidence that the cause of the fright was the combination of unusual noise and appearance of the car approaching with unslackened speed; that Kroessin stood in front of the horses, vainly trying to hold and calm them while the car was still many feet away; and that just before it reached them, they suddenly swerved, hurling him just in front of, instead of under the car; that the motorman saw, or could have seen by the exercise of reasonable care, that the horses were frightened at and becoming more violent by reason of the approach of his car; and that the state of facts was such as made it his duty to reduce the speed of the car or stop it altogether, if necessary, to enable the horses to be brought under such control that either they or the car could be moved without danger to life or property. There was no emergency or public requirement that rendered it impracticable to slow or stop the car. To have done so would not have interfered with either the public or defendant's convenience or interest. We think the evidence shows that the degree of the horses' fright was such that the motorman might reasonably have anticipated danger therefrom unless he reduced the speed of or stopped the car, and that if he did not actually observe their condition, he should have done so in time to control the car so as to avoid such danger.

Many decisions are cited on both sides bearing upon accidents of this character, where horses were frightened by approaching or passing street cars, but it would unduly prolong this opinion and subserve no particular purpose to analyze them. The facts vary in each case and the cases frequently turn on peculiar circumstances, or some material fact not present in the others. There is little, if any conflict, however, about the law pertaining to the nature or extent of the duty street car companies owe to those driving or using horses in the streets. The law applicable to

this state of facts is fairly summarized in the following language: "A motorman of an electric car, who sees a horse which appears to be restless or refractory, must manage the car in such a way as to relieve the traveler from his dilemma." 2 Nellis on Street Railways, sec. 395, (2nd Ed.); see also 2 Joyce on Electric Law (2nd Ed.) sec. 597. "It is the duty of the operator of a car to exercise reasonable and ordinary care under the circumstances to avoid the danger of frightening horses, and hence the company will be liable if the fright of a horse or team is caused by the negligent making of unusual and unnecessary noises, or appearances, in the operation of its cars." 36 Cyc. pp. 1488, 1489.

The duty of the street car company and its motorman has been so often set forth in decisions involving similar facts, and with such unanimity, that it is hardly necessary to refer to them. As said in a similar case (*Doran v. Cedar Rapids & M. C. Ry. Co.,* 117 Iowa 442): "The rule requiring the motorman of an electric car to do what he reasonably can to avoid a danger which is reasonably apparent seems to us too elementary to require elaborate citation of authorities. It would certainly not be necessary in all cases that the car be stopped as soon as it is evident that animals on the highway have become uneasy and even frightened, but it certainly is his duty to take reasonable steps by way of reducing the speed of the car to avoid an injury which he may anticipate as likely to result from the frightened condition of animals on the street." While in the case at bar the motorman claimed that he did reduce his speed, yet there was evidence tending to show that he did not do so, at least as soon as he should have done, and, of course, the question of what steps should be taken in the exercise of reasonable care in such a case by the motorman to avoid an accident is for the jury. 27 Am. & Eng. Encyc. of Law (2nd Ed.) 92; *Oates v. Metropolitan St. Ry. Co.,* 168 Mo.

535; *Flewelling v. Lewiston & A. Horse R. Co.*, 89 Me. 585; *Cameron v. Jersey City H. & P. St. Ry. Co.*, 70 N. J. Law, 633; *Lightcap v. Philadelphia Traction Co.*, 60 Fed. 212; *McCann v. Consolidated Traction Co.*, 59 N. J. L. 481; *Springfield Consol. Ry. Co. v. Ankrom*, 93 Ill. App. 655; *Richter v. Cicero & P. St. Ry. Co.*, 70 Ill. App. 196; *Freyer v. Aurora, E. & C. Ry. Co.*, 123 Ill. App. 423. We are disposed to accept the verdict of the jury as decisive of the facts in this case, and think there was sufficient evidence to justify them in concluding that the motorman saw, or ought to have seen in time to avert any danger, that the horses were unduly frightened at his car and were likely to become unmanageable, and that he was negligent in not slackening the speed or stopping the car before he reached them. He had timely notice of their condition and, under the circumstances, should have anticipated the danger.

It is urged that the court erred in not eliminating the third and fourth counts from consideration by the jury. While we do not think there was sufficient evidence to base a verdict thereon, it cannot be said that there was no evidence tending to support them. For that reason there was no error in refusing defendant's instructions directed against them, or in sending the declaration to the jury because it contained such counts. While, as has been stated by our Supreme Court, it is the better practice not to allow the declaration to be taken by the jury while considering upon the verdict, yet it is not reversible error to allow it. (*Hanchett v. Haas*, 219 Ill. 546), unless possibly when it contains prejudicial counts which have previously been eliminated, which is not the case here. *Elgin, A. & S. Traction Co. v. Wilson*, 217 Ill. 47; *Chicago City Ry. Co. v. Reddick*, 139 Ill. App. 161.

Error is alleged in refusing the following instruction requested by defendant:

"4. If you believe from the evidence that the deceased ran out and grabbed the horses and thereby frightened them so as to cause them to swing around and throw him into the path of the car, and that the deceased in so doing failed to exercise ordinary care for his own safety, and if you further believe from the evidence that the accident in question would not have resulted but for the conduct and action of the deceased in so doing (if from the evidence you believe he so did), then you are instructed that the deceased was guilty of contributory negligence, and in such event the plaintiff cannot recover, even if you believe that the defendant or its servants were also guilty of negligence as charged in the declaration or some count thereof."

Other instructions were given stating that plaintiff could not recover if deceased was not in the exercise of ordinary care. But it is claimed that defendant was entitled to this concrete application of its theory that deceased was guilty of contributory negligence in running towards the horses. The great preponderance of the evidence is that the deceased had reached the horses' heads and was holding them by the reins before the car got there and before they swerved. The evidence is so extremely slight and dubious on which this tendered instruction was predicated, that had it been the basis of an independent suit, no court would have permitted it to go to the jury. While we are aware that not quantity but quality of evidence furnishes the basis for such an instruction, when its quality is so weak that it will not reasonably support the theory on which an instruction is tendered, it is pressing the contention beyond reason to hold that the refusal of such an instruction is necessarily reversible error. In our opinion the evidence did not justify such a theory or such instruction. It is predicated upon the probable sudden movement of the deceased to grasp the horses before they could run away, in which act itself there was nothing to indicate negligence, but, on the contrary, commendable diligence and care, and on

the conjecture rather than legitimate inference that otherwise the horses would necessarily have swerved towards the sidewalk instead of the street. The evidence is so preponderant and convincing that the deceased had reached the horses and was standing in front of them, holding them before they swerved, and that their movement was the culmination of a fright that began with the appearance of the car and continued, increasing in degree, until just before the car got to them, that it is impossible to believe that a jury could have given any such significance to the evidence of two of defendant's witnesses that deceased "ran" towards the horses that defendant now seeks to give it. To say that horses, quivering and swaying with excitement and shaking and raising their heads towards a strange object with flapping curtains coming rapidly towards them, would all at once forget the object of their fright and jump towards it because their own driver hurriedly caught them by the bits, presents too large a draft upon the imagination of one who knows anything about horses. The use of the word "ran" by these two witnesses who testified in behalf of defendant was not supplemented by any other testimony that indicated that the horses were frightened by deceased. One of these witnesses, who was riding on a car coming from the south, said: "My attention was first directed to the team because I saw them getting frightened at the sweeper. When they got frightened they started to turn right toward the sweeper, toward the track the sweeper was on." The other witness stood beside the motorman and said the deceased "ran" towards the heads of the horses, but he did not see him get hold of their heads. The motorman, testifying for defendant, said: "He moved slowly and walked up to them." Another of defendant's witnesses said: "He caught hold of the reins under the horses' neck. While he was dong this, the sweeper was coming along at the same rate of speed." Plaintiff's two witnesses testified that he was holding the horses by the head and when the car got to within

fifteen to twenty-five feet, they swerved around. There was virtually no difference in theory as to the cause of fright. All of defendant's own witnesses describe the horses as in a state of fright at the approaching car. Defendant's claim rests upon a mere scintilla of evidence and not on evidence that reasonably tends to support its theory. In that state of the testimony, we are not disposed to regard the refusal of such instruction as reversible error. But, if there was any ground whatever justifying submission of either the third or fourth count to the jury, then that instruction, without qualification was improper.

Error is also urged to the giving of the following instruction:

"8. The court instructs the jury that the law only required the deceased, Richard Kroessin, to exercise ordinary care for his own safety at and before the time he received the injury, and what is ordinary care depends upon the circumstances of each particular case, and is such care as a person of ordinary prudence would usually exercise under the same or similar circumstances."

In criticism of this instruction, it is said that it assumes a person of ordinary prudence would have permitted himself to be surrounded by circumstances similar to those permitted by deceased, and was prejudicial in that it diverted the jury's attention from defendant's contentions that the deceased was contributorily negligent, (1) in facing the horses with their left instead of their right sides towards the curb on that side of the street contrary to a city ordinance; and (2) in getting into the situation occupied by him at and before the time he received the injury. It expressly refers to the exercise of care "at and before the time he received the injury," and we do not think it was calculated to mislead the jury in other respects. In fact, one of defendant's own instructions on the same matter is equally subject to the same criticism. We think the judgment should be affirmed.

*Affirmed.*